IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA ex rel.    )
JAMES HARRIS,                       )
                                    )
                 Petitioner,        )
                                    )
        v.                          )        No. 07 C 1578
                                    )
FRANK SHAW, Warden, Stateville      )
Correctional Center,                )
                                    )
                 Respondent.        )

## OPINION AND ORDER

### I.  PROCEDURAL BACKGROUND

### A.  State Court Proceedings

During the early morning hours of February 10, 1983,
Jesse James, Sr., the owner of a tavern located on the south side
of Chicago, and Theresa Woods, a waitress at the tavern, were
robbed at gunpoint shortly after closing the tavern.  During the
robbery, James was shot to death and Woods was shot in the
shoulder.  Woods was able to call for help.  Petitioner James
Harris was apprehended near the place of the shooting in
possession of the weapon fired.  In 1984, following a jury trial
in the Circuit Court of Cook County, Illinois, Harris was found
guilty of the murder of James and the attempted murder of Woods.

Harris was also convicted of one count of aggravated battery and two counts of attempted robbery. Harris was sentenced to death on the murder conviction and received terms of imprisonment for the other felonies.

On appeal to the Supreme Court of Illinois, the court entered a supervisory order requiring the trial court to make findings as to whether the prosecution exercised peremptory challenges in a discriminatory manner contrary to <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986). <u>See</u> <u>People v. Harris</u>, 506 N.E.2d 1315 (Ill. 1987). Thereafter the court held that evidence of a prior killing should have been excluded in the sentencing phase of the death penalty case and an additional hearing was required on the issue of whether the prosecution exercised certain of its peremptory challenges in a discriminatory manner. The case was remanded for further consideration of the <u>Batson</u> issue and a new sentencing hearing. <u>People v. Harris</u>, 129 Ill. 2d 123, 544 N.E.2d 357, 376-86 (1989), <u>cert. denied</u>, 494 U.S. 1018 (1990) ("<u>Harris I</u>").

On remand the trial court made findings that the State had not exercised its challenges in a discriminatory manner. A different judge held a sentencing hearing and reimposed the death penalty and other sentences. On direct appeal, the Supreme Court of Illinois held that the prosecution's explanations for

challenging African-American venire members were race neutral and not pretextual.  People v. Harris, 164 Ill. 2d 322, 647 N.E.2d 893 (1994), cert. denied, 516 U.S. 885 (1995) ("Harris II").

Petitioner sought post-conviction relief.  The Cook County Circuit Court denied the petition without a hearing.  On direct appeal, the Supreme Court of Illinois again considered Batson issues ruling that there was no discriminatory exercise of peremptory challenges.  However, on a claim that the prosecution, in violation of Brady v. Maryland, 373 U.S. 83 (1963), withheld medical documents that would have impeached the testimony of a penalty phase aggravation witness, the court remanded the case to the Circuit Court for a hearing on the merits of the Brady claim. People v. Harris, 206 Ill. 2d 1, 794 N.E.2d 314, 324-33 (2002) ("Harris III").

Before a hearing was held on the remanded Brady claim, the Governor of Illinois commuted then-pending death sentences, including petitioner's, to a term of natural life.  On a motion of the prosecution, the trial court dismissed the Brady claim as moot and the Illinois Appellate Court affirmed.  People v. Harris, No. 1-04-1062 (Ill. App. Ct. 1st Dist. June 28, 2005) ("Harris IV").  The Illinois Supreme Court initially remanded the case to the Appellate Court with directions to vacate the order dismissing the appeal as moot.  People v. Harris, 217 Ill. 2d

612, 840 N.E.2d 1229 (2006). However, the court later vacated its remand order and denied leave to appeal. People v. Harris, 849 N.E.2d 334 (Ill. 2006).

The parties agree that Madej v. Briley, 371 F.3d 898, 899 (7th Cir. 2004), holds that a constitutional claim is not moot and must be considered in a federal habeas corpus proceeding because of the possibility that the petitioner could be sentenced to a term of years rather than natural life if a new sentencing hearing is held. See also Simpson v. Battaglia, 458 F.3d 585, 595 (7th Cir. 2006); United States ex rel. Harris v. McCann, 558 F. Supp. 2d 826, 836-37 (N.D. Ill. 2008).

## B.  Federal Habeas Corpus Petition

Respondent concedes that the federal petition is timely and that Harris has fully and sufficiently exhausted his state court remedies regarding all the claims contained in the federal petition. Here, Harris raises three grounds for relief. Ground One raises Batson issues regarding seven of the African-American venirepersons who were stricken from the jury. These issues were addressed by the Illinois Supreme Court on direct appeal in Harris I and Harris II. Ground Two raises the ineffective assistance of counsel claim addressed in Harris III regarding defense counsel failing to establish that two venirepersons were

- 4 -

African-American and their being stricken from the jury pool.

Ground Three raises the <u>Brady</u> issues addressed in <u>Harris III</u>.

## II.  BATSON CLAIMS

### A.  Batson Standards

In 1986, <u>Batson</u> established a

> three-part process for evaluating claims that a
> prosecutor used peremptory challenges in
> violation of the Equal Protection Clause.  First,
> a defendant must make a <u>prima facie</u> showing that
> a peremptory challenge has been exercised on the
> basis of race.  476 U.S., at 96-97.  Second, if
> that showing has been made, the prosecution must
> offer a race-neutral basis for striking the juror
> in question.  <u>Id.</u>, at 97-98.  Third, in light of
> the parties' submissions, the trial court must
> determine whether the defendant has shown
> purposeful discrimination.  <u>Id.</u>, at 98.

<u>Miller-El v. Cockrell</u>, 537 U.S. 322, 328-29 (2003).  <u>Accord</u>

<u>Snyder v. Louisiana</u>, 552 U.S. 472, 128 S. Ct. 1203, 1207 (2008).

Harris contends that the step-three findings of the

Illinois courts are inconsistent with the evidence of record.

The challenged factual findings are considered in light of the

standards applicable under the Antiterrorism and Effective Death

Penalty Act of 1996 ("AEDPA") Pub. L. No. 104-32, 110 Stat. 1214

(April 24, 1996).  Harris does not challenge the Illinois courts'

application of legal principles set forth in <u>Batson</u> and its

progeny, for which 28 U.S.C. § 2254(d)(1) would apply.  <u>See</u>

*Rice v. Collins*, 546 U.S. 333, 342 (2006); *Lamon v. Boatwright*, 467 F.3d 1097, 1100-01 (7th Cir. 2006). Instead, he challenges the factual findings, which requires a showing that the state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *Rice*, 546 U.S. at 338; *Mahaffey v. Ramos*, ___ F.3d ___, 2009 WL 4894670 *3 (7th Cir. Dec. 21, 2009); *Lamon*, 467 F.3d at 1100. The findings of the state court are presumed correct unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005); *Lamon*, 467 F.3d at 1102. This standard is more demanding than the clear error standard that would apply on direct review. *See Rice*, 546 U.S. at 338; *Hennon v. Cooper*, 109 F.3d 330, 334 (7th Cir. 1997). *See also Sanchez v. Gilmore*, 189 F.3d 619, 623 (7th Cir. 1999) (§ 2254(d)(2) is accompanied by § 2254(e)(1)'s "rigorous burden of proof"); *Conner v. McBride*, 375 F.3d 643, 649 (7th Cir. 2004) (same). Section 2254 requires unreasonable error which, at a minimum, requires that the pertinent finding of the state court be against the clear and convincing weight of the evidence before it. *Conner*, 375 F.3d at 649; *Ward v. Sternes*, 334 F.3d 696, 703-04 (7th Cir. 2003). *See also Mahaffey*, ___ F.3d at ___,

2009 WL 4894670 at *3 (quoting United States v. Stephens, 514 F.3d 703, 712 (7th Cir. 2008)) (reversal requires "a definite and firm conviction that a mistake has been committed.") There is no basis for overturning the state court finding of no discrimination "unless the reason given [by the prosecution] is completely outlandish or there is other evidence which demonstrates its falsity." Id. (quoting Tinner v. United States Ins. Co. of Am., 308 F.3d 697, 703 (7th Cir. 2002)).

With the AEDPA fact determination standard in mind, each of the peremptory strikes at issue will be considered in turn. If the findings of no discriminatory purpose was in error as to even a single venireperson, Harris is entitled to a new trial. Snyder, 128 S. Ct. at 1208. In considering whether a particular venireperson was stricken because of his or her race, generally all facts and circumstances going to racial animosity must be considered, including the strikes of other venirepersons.[1] Id.

The explanation for striking a particular venireperson may be so unconvincing, the unconvincing explanation, by itself, will suffice to support Batson error. Id. Also, the Seventh Circuit has held that the focus at the third Batson step is on

---

[1] In this case, there were 17 prosecution peremptory strikes of African-Americans. The jurors that deliberated included two African-Americans.

whether any particular venireperson was stricken for discriminatory reasons, not the overall number of persons of a particular race on the jury or who were stricken from the venire. See Coulter v. McCann, 484 F.3d 459, 467-68 (7th Cir. 2007).

## B. Woodward

As to venireperson Lucille Woodward,[2] prosecutor Franks noted that she was divorced and her juror card had omitted her age and the occupation of her former husband. He also noted that she had lived in the general area where the crime occurred. He also stated that he did not have a lot of information about her. (The voir dire was essentially conducted by the trial judge.) But, according to the prosecutor, those were not necessarily facts that would have caused him to have exercised a peremptory challenge. Batson Hearing Transcript ("BH") 63-64. The prosecutor indicated he believed that he had done so for the reason that Woodward had been questioned at the end of one day and then included with a group of 11 new persons questioned the next day. Thus, by the time he had to make a decision, information about the other 11 was fresher than information about Woodward so he struck her because he could not remember enough

_____

[2]Harris I, 544 N.E.2d at 382-83, refers to Woodward as the "twelfth venireperson."

about her from the prior day and the juror card he had was incomplete.  Id. at 64-66.  Harris argues that the prosecutor should not be believed because he did not strike a White venireperson who was divorced, Woodward lived three miles from where the crime occurred, and he could have questioned her as to her age.  Although mentioning the divorce and where she lived, the prosecutor did not testify that those were the reasons that actually motivated the strike.  The state court found that the strike was exercised because of the delay in having to make the decision and the prosecutor's fresher recall as to others in the 12-person panel.  Harris I, 544 N.E.2d at 382-83.

> Defendant misconstrues the State's explanation.  While it is certainly true that the State cannot rebut a prima facie case of discrimination by stating that it does not know why it exercised its peremptory challenges (see Batson, 476 U.S. at 98 ("prosecutor [may not] rebut the defendant's case merely be (sic) denying that he had a discriminatory motive")), that is not what the State is attempting here. Instead, the State in this case knew precisely why it exercised its challenge:  the State exercised its challenge because due to the timing and order of questioning during voir dire, the prosecutor had lost his recollection of the twelfth venire person.  As a result, the prosecutor did not have enough information about the venire person to feel comfortable with having her on the jury.  This explanation is race-neutral, clear and reasonably specific.
> Nevertheless, defendant argued that such an explanation should not be allowed because otherwise the State could always justify its use of peremptory challenges by claiming that it

> lacked sufficient recollection; thus making a
> mockery of <u>Batson</u>. We do not share defendant's
> fears, however, because such an explanation will
> usually only be credible where a unique set of
> facts, such as those that occurred in this case,
> is present. Unless such facts are present, we
> are confident that defendants will be able to
> prove, and trial courts will find, that
> explanations based upon a lack of recollection
> are pretextual.

<u>Harris I</u>, 544 N.E.2d at 383.

While the prosecutor indicated a lack of a clear

recollection as to his motivations, it cannot be held that the

state court's finding lacks support or is contradicted such that

it was an unreasonable determination of the facts. The striking

of Woodward is not a sufficient ground for granting federal

habeas corpus relief.

## C. Stearn

At the time of the voir dire, Wilbert Stearn[3] had been a

steelworker at the same job for 14 years. He had previously been

a school teacher and was married to a school teacher. Stearn had

a bachelor's degree in music. As to others, prosecutor Franks

had stated that he preferred persons in stable situations and

with ties to the community, including persons who had worked at

the same job for a long time, lived in the same home, and had

children. As the prosecutor explained, however, Stearn also had

---

[3]<u>Harris I</u>, 544 N.E.2d at 381-82, refers to Stearn as the
"eleventh venireperson."

characteristics that he disfavored. Stearn had been a teacher and was married to a teacher. The prosecutor believed teachers and their spouses were less likely to follow a judge's instructions and more likely to be sympathetic to individuals. He also stated that he tried to avoid creative persons such as musicians who he believed to be less likely to follow the law. The state courts accepted the prosecutor's explanation that the additional characteristics overrode the fact that Stearn otherwise met his preferences for a juror. The Supreme Court stated:

> In the present case, there is little merit to defendant's contention that, since the State allowed a white teacher onto the jury, the State's explanation was pretextual. Our conclusion is based upon the fact that by the time the white teacher was questioned during voir dire, the State had exercised all of its peremptory challenges. As a result, the State had no choice as to whether or not it should exercise a peremptory challenge. Consequently, no inference of discrimination arises in this case from the fact that a white teacher served on the jury.
> The trial court agreed that there may have been something suspicious about a person who was a teacher, and who had even done graduate work in education, leaving the teaching profession to take a job as a steelworker, an occupation described by the trial court as being a "job of conceivably a lesser status." We cannot say that this finding of fact by the trial court is against the manifest weight of the evidence.

Harris I, 554 N.E.2d at 382.

There is no basis for holding that the state court's factual determination was unreasonable or against the clear and convincing weight of the evidence. The striking of Stearn is not a sufficient ground for granting federal habeas corpus relief.

### D. Lucas

During voir dire, Lisa Lucas[4] stated that she had lived on the south side of Chicago for two years, had been in cosmetology school for five months after graduating from high school, and had worked as a hostess at a fast-food restaurant for three years, including when she was in high school. She lived with her parents, who both worked at factories. Her mother was an assembler and her father was a foreman. She also stated she could be fair to both sides. Lucas was not asked about whether serving on the jury would interfere with her studies, nor did she raise any issue on her own that it would interfere. Voir Dire Tr. ("VD") 140-43.

Prosecutor Franks, who was providing explanations of his strikes more than three years after the voir dire, refreshed his recollection with his written notes. BH 56. He stated:

> In the margin or in the notes that I made as to Lisa Lucas, I did make notice of the fact that

---

[4]Harris I, 544 N.E.2d at 380, refers to Lucas as the "ninth venireperson."

she was the type of a juror that I put down in my notes that looked meek and sleepy. She was extremely quiet, was not answering questions in a forthright manner.

Even though, again, the transcript might indicate that she did answer those questions, it was the manner in which she answered them and her demeanor on the, in the jury box while she was being questioned and while other jurors were being questioned that I made note of.

Also on her card was something that I also took note of, and something that will run through a number of the comments that I will make.

The card was not complete in the sense that Lisa Lucas' age was not reflected on that card.

Also, I believe Miss Lucas indicated that she was attending a beauty school at that time and it was not clear from the questions of her whether or not if she missed a week of such school, whether that would cause her a serious problem in passing the course where she was now attending, and I felt that that also might have an effect on her mind during the course of such a serious case.

So, for those reasons, I did not, I used a peremptory challenge for Lisa Lucas.

Id. at 56-57.

As to Lucas, the trial court found:

We then move to some other categories of use of peremptory challenges. One was Lisa Lucas. She was described by Mr. Franks as being meek and sleepy. And, incidentally, throughout the testimony in this court by Mr. Franks, I want to state that I believed his credibility as a witness.

His memory on some jurors was sharp and complete. And on others, as one would expect, it was not as sharp and complete. It seems to me that if a prosecutor c[a]me in and remembered everything that happened over three years ago, with a great sense of particularity, one would have to wonder. In this case, Mr. Franks was

extremely candid throughout the proceedings, and I believed his explanations throughout.

The Lisa Lucas case presents a somewhat troubling situation for the Court because obviously it would be easy for a prosecutor to say that somebody appeared hostile, or appears meek, or appears sleepy, or appeared disinterested, he winked or smiled at the other side.

So this is obviously a category like all other categories that we have that must be closely scrutinized. From the evidence that I had before me and from my belief in the integrity and credibility of Mr. Franks, I believe his explanation and I believe that that was a non-racial use of a peremptory challenge and was a neutral explanation of why that was done.

Id. at 136-37.

In upholding this finding, the Illinois Supreme Court stated:

The ninth member of the venire excused from serving on the jury was described by the prosecutor as being a "meek and sleepy" juror who did not answer questions in a forthright manner. The prosecutor also felt uncomfortable with her demeanor. Defendant argues, and we agree, that explanations which focus upon a venireperson's body language or demeanor must be closely scrutinized because they are subjective and can be easily used by a prosecutor as a pretext for excluding persons on the basis of race. (See People v. Charron (1987), 193 Cal. App. 3d 981, 991, 238 Cal. Rptr. 660, 666-67.) However, the trial court in this case stated that it was aware of the problems posed by subjective, demeanor-based explanations for excluding venirepersons. As a result, the court closely scrutinized the State's explanations and nothing

in the record here indicates to us that the trial
court's finding was erroneous.

Harris I, 544 N.E.2d at 380.

While Franks mentioned other possible reasons for
striking Lucas besides her demeanor, it is clear that the trial
court and the Illinois Supreme Court relied only on the demeanor
explanation.[5] As Franks indicated in his statements, the voir
dire transcript does not show any hesitations or uncertainty.
The trial judge made no direct finding indicating he recalled
Lucas's demeanor, but that was understandable in that the voir
dire was more than three years earlier. Cf. Snyder, 128 S. Ct.
at 1209 (even when Batson objection is raised at the trial, trial
judge would not necessarily recall the demeanor of a venireperson
from the prior day when dozens others had also been questioned in
voir dire). Still, the trial judge's finding as to the
credibility of the prosecutor's explanation is entitled to

---

[5]Harris rejects the possible explanation that Lucas would
have missed a week of school, noting that anyone selected as a
juror would be missing aspects of his or her daily life. Also,
Lucas herself never raised this concern. If that proffered
explanation had been relied upon and been the only stated non-
discriminatory explanation, there might very well be a basis for
holding the finding of no discrimination to be an unreasonable
factual determination. Cf. Snyder, 128 S. Ct. at 1209-12 (on
direct review it was clear error to accept explanation that
student-teacher was stricken so he would not be worried about
missing his student-teaching assignment while on jury where his
supervisor had been contacted and stated it would not be a
problem and the student-teacher did not express any further
worry).

substantial deference.  See id. at 1208, 1209.  Here, the trial

judge made his credibility determination based on Frank's lengthy

statement regarding 17 strikes and may also have considered

Franks's conduct during the trial itself.  While Franks mentioned

two other possible reasons for striking Lucas--interference with

Lucas's school and an incomplete juror card--both of which could

be questioned and thus bring down his credibility somewhat, those

are not a sufficient basis for holding the trial court's finding

to be an unreasonable determination that is overcome by clear and

convincing evidence.  The striking of Lucas from the venire is

not a sufficient basis for granting federal habeas corpus relief.

### E.  Alexander

Emma Alexander[6] lived in Hyde Park and was employed as an

administrative secretary at Northwestern Memorial Hospital, where

she had worked for six years.  She had previously worked as a

cashier at a Sears store.  Alexander's husband worked at the same

hospital in the mental health field.  Franks explained that he

believed residents of Hyde Park, where the University of Chicago

is located, were more scholarly and academic than other residents

of Chicago and therefore less likely to follow a judge's

instruction.  He also thought she was pretentious because she

---

[6]Harris I, 544 N.E.2d at 380-81, refers to Alexander as
the "tenth venireperson."

placed too much emphasis on "administrative" when stating her job title. He was also concerned that her husband was in the mental health field.

As he did before the Illinois Supreme Court, Harris challenges the credibility of the Hyde Park explanation. The Illinois Supreme Court rejected the contention that this explanation should not be accepted because the prosecution had not shown that the asserted generalization about Hyde Park residents was true or that Alexander possessed that characteristic. <u>Harris I</u>, 544 N.E.2d at 380-81. Here, Harris focuses on the argument that, even if the prosecutor's stated views as to Hyde Park residents are genuinely held, it is not credible that he attributed such characteristics to Alexander whose then-current and prior positions of employment were practical and not scholarly. While that may be a reason to question the stated explanation, it is not clear and convincing evidence that requires overturning the state court finding. The striking of Alexander from the venire is not a sufficient basis for granting federal habeas corpus relief.

## F.  Pickett

Milton Pickett[7] lived in Evanston.  At the time of the voir dire, he was married to a physical education teacher and had a 12-year-old child.  Pickett had worked as a forklift operator at the same company for 13 years.  He also worked part-time as a barber.  When asked if he had any "friends or family members" who were lawyers, Pickett responded that he had a friend, "Fred Alexander," who was a lawyer.[8]  When asked by the judge if the lawyer had been an Evanston city councilman, Pickett simply responded, "Yes, sir."  Pickett also responded that he had never discussed legal work or cases with the lawyer.  The entire colloquy regarding this lawyer takes up less than one transcript page.  The prosecutor did not request any follow-up questions about the lawyer or any other subject regarding Pickett.

---

[7]Harris I, 544 N.E.2d at 383-85, refers to Pickett as the "thirteenth person."  After further findings were made on remand, the new findings are discussed in Harris II, 647 N.E.2d at 898-900.

[8]Pickett initially referred to the lawyer as a friend. When asked if he knew him "as a neighbor or--," Pickett interrupted and responded "He's just a friend, associate."  He then responded "Yes" to the question:  "You met him in some capacity and were friends after that?"

During the <u>Batson</u> hearing, the prosecutor stated, in part,[9] regarding Pickett as follows:

>        THE COURT:  This is in response to inquiry I
> made, but is--
>        MR. LEVITIN [Harris's counsel]:  I
> understand.
>        THE COURT:  (Continuing)--about his attitude
> about teachers.  It does not pertain to this
> juror other than the fact that the juror's wife
> is a teacher.  Overruled.
>        MR. FRANKS:  Judge, my main reason as to
> Milton Pickett though was not because he was
> married to a teacher.  There was a colloquy
> between your Honor and Milton Pickett that I felt
> very left out during.
>        When asked about whether Milton Pickett knew
> any lawyers, he responded that he knew one.  He
> was a friend by the name of Fred Alexander.  Your
> Honor indicated in the record that you seemed to
> know that individual and asked, wasn't he a city
> councilman, and--
>        THE COURT:  Actually this juror lived in
> Evanston.  I think the lawyer's name was
> Roosevelt Alexander.  I don't know how the name
> Fred got in the record.
>        MR. FRANKS:  I was just looking at the
> transcript.  I recall there was a discussion
> about, you know, the lawyer that he mentioned and
> the fact he was a city councilman, and there was
> some smiling between the two of you, and the fact
> that he was impressed or whatever, that you
> recognized or knew that person that he had
> mentioned.
>        That left me with the thought about, who is
> this Mr. Alexander.  He's obviously a political
> person in Evanston.  I did not know him.  I
> didn't know if he was a candidate or a

---

[9]It is noted that the record provided to this court is
missing page 60 of the <u>Batson</u> hearing transcript.  That page of
the transcript is quoted in part in the Second <u>Batson</u> Ruling
("SBR") A-6-7.  This missing page includes a statement by Franks
that he usually did not accept jurors who are school teachers or
spouses of school teachers.

politician that was interested in one specific
issue or no issues; if he was a person that was
a pro-abortion or ban-the-bomb or whatever.

I did not know this man, I did not know his
politics. The contact between Mr. Pickett was
left very up in the air between Mr. Pickett and
the man, Mr. Alexander, who is a friend or an
associate. I believe he used the words, both
friend and associate.

So again, I had a situation where I did not
know the importance of Mr. Alexander in Mr.
Pickett's life, and I thought it best, and I
thought it best, because of that lack of
knowledge, to exercise a peremptory challenge.

Also aware Mr. Pickett indicated he was
self-employed and was a barber, and while he
would be in trial, he certainly was going to
have a loss of income.

THE COURT: I guess that's what he did
indicate, but his card showed that he was a lift
truck driver.

MR. FRANKS: I believe that was a second
job, Judge, and it was not indicated on his card
which was of interest, but he kind of had a
second job after hours or whatever, and that was
that of a barber.

BH 61-63.

In finding no <u>Batson</u> violation, the trial judge initially

found:

Mr. Franks stated that he did not know all
about Mr. Alexander, but, from the information
that was received in the courtroom here, he knew
that he was in a political arena in Evanston. He
knew that he was a lawyer, and he was a lawyer.

I don't know if it was articulated, but
that is a lawyer representing persons who had
problems. I think that that is a significant
reason to excuse a juror. The juror related that
Mr. Alexander was his friend and I think that is
a justification for using a peremptory challenge;
the same reason that the Defense could, if a

person said they had a friend who was a state's attorney.

BH 134.

In Harris I, 544 N.E.2d at 384, the Illinois Supreme Court interpreted the trial judge's finding as being that the prosecutor had stricken Pickett for the non-discriminatory reason that he was a friend of a criminal defense attorney. Since that finding was not supported by the record, Harris I remanded this issue for further findings. Id. at 384-85. Following this remand, the trial judge found as follows:

> I believe the prosecutor used a race neutral reason for preempting Mr. Pickett.
> Insofar as credibility I believe the truthfulness of Mr. Frank's explanation. If he were concocting an explanation about Mr. Alexander he could have easily done some research and found out facts about Mr. Alexander. Franks knew the following:
> That Pickett described himself as a friend or associate of Mr. Alexander.
> That Mr. Alexander was at one time an Evanston city councilman and Mr. Alexander was a lawyer. Franks did not know any other things about Mr. Alexander including his stands on political issues, what type of law he has practiced.
> I believe it is fair to describe the city councilman as Franks did as a "political person." Persons who see[k] office must seek votes and must present themselves to the people to gain or maintain office.
> Is the venire person's association or friendship with a lawyer and political person sufficient to amount to a reason to preempt a juror?
> I believe it is. Being a political person amounts to having some agenda for the community

representative. A venire person who might associate with that agenda may be more inclined to follow the agenda than make a true verdict based on the law and the evidence. Given an association and friendship with a political person I believe that Mr. Franks could well exercise the peremptory challenge properly under the law.

My earlier findings about Mr. Picket[t] is attached as Appendix A. Within the finding I referred to Mr. Alexander as a lawyer representing persons who had problems. There is no evidence of Mr. Alexander's clients and I apologize for the statement. Other than that I adhere to the finding regarding Mr. Pickett.

SBR A-9-10.

As he argues in this court, Harris argued to the Illinois Supreme Court that the prosecutor's lack of knowledge about Alexander should be seen as pretext because the prosecutor could have asked questions to fill in the missing information. See Harris II, 647 N.E.2d at 898-99. In denying the challenge to the strike of Pickett, Harris II held as follows:

Applying these principles to the case at bar, we are satisfied that the trial judge's determination that the State provided a race-neutral explanation for its decision to exercise a peremptory challenge against Milton Pickett is not clearly erroneous. The prosecutor explained that one of his concerns was that he did not have more information about Pickett's friendship with the council member, or about his political views.

Contrary to the defendant's argument, there is no requirement that a court reject a prosecutor's explanation simply because it rests in part on a lack of knowledge. As we have stated, determining whether the State has

properly provided a race-neutral explanation for
the exclusion of a particular juror will
primarily be a question of credibility; although
a prosecutor's complaint that he lacks
information regarding a juror might warrant
extra caution on the part of the trial judge and
reviewing court, it is not automatically
invalid. Our earlier opinion in this case
counseled that an explanation based on a lack of
knowledge deserves close scrutiny, yet the court
did not suggest that such an explanation may
never stand. (See Harris [I], 129 Ill. 2d at
188, 135 Ill. Dec. 861, 544 N.E.2d 357[, 386].)
Although inquiry by the State could have
clarified some of the matters left uncertain by
the voir dire, we cannot say that the failure of
the prosecution to propose additional questions
regarding Pickett's friend fatally undermines
its proffered explanation for the challenge to
this prospective juror. See People v. Kitchen
(1994), 159 Ill. 2d 1, 20-21, 201 Ill. Dec. 1,
636 N.E.2d 433.

In the proceedings on remand, the State
provided an explanation for its failure to
attempt to learn more information about the
prospective jurors during voir dire. Although
this explanation was given by a person who had
not participated in the selection of the jury in
this case, we do not agree with the defendant
that we are foreclosed for that reason from
considering it. The successor prosecutor
explained that asking jurors further questions
can threaten to taint the entire venire through
the disclosure of sensitive information and can
unnecessarily lengthen an already long process.
We find these concerns to be legitimate.

Further support for the State's decision to
exercise a peremptory challenge against Pickett
is found in the two additional explanations
provided by the prosecution at the original
Batson hearing. As we have noted, the
prosecutor said that he also based the challenge
on Pickett's wife's employment as a school
teacher and on Pickett's own part-time work as a
self-employed barber. The prosecutor explained
that he customarily challenged teachers and
spouses of teachers, and that he was concerned

that Pickett would suffer a loss of income if he were compelled to serve as a juror in this case.

The defendant argues, however, that we are precluded from now considering these additional reasons because the trial judge, on remand from Harris I, relied solely on Pickett's friendship with the Evanston city council member and failed to mention either of the two other grounds originally provided by the prosecutor. The defendant apparently believes that the only legitimate reasons that may now be cited in support of the peremptory challenges exercised in this case are the ones given by the judge on the remand from Harris I.

We do not agree with the defendant that the scope of our review in the present matter is so circumscribed.

* * *

Turning to the two additional grounds cited by the prosecution, we find both explanations to be free of discriminatory intent. Whatever one might say of the prosecutor's view regarding teachers and spouses of teachers as potential jurors, we consider this to be a race-neutral reason for the decision to exclude Pickett. In addition, we note that Pickett worked part-time as a barber, and the prosecution expressed concern that he could suffer a loss of income if he were empaneled as a juror in the case. This, too, is a race-neutral explanation for the juror's exclusion. In sum, we conclude that the trial judge's determination that the prosecutor had provided valid grounds for its challenge to Pickett is not clearly erroneous.

Id. at 899-900.

The fact that the prosecution did not attempt to ask Pickett additional questions about his friend is not clear and convincing evidence that the state court findings are in error. As stated by the Illinois Supreme Court, questioning the juror

may result in statements that would taint the other jurors. Also, a prosecutor might fear that additional questioning on a sensitive subject such as politics could result in questioning that would leave some jurors with negative feelings toward the prosecutor.  Or a prosecutor might be judicious in asking additional questions out of a fear, founded or unfounded, that a judge would be annoyed if the prosecutor asked too many additional questions.  But even if none of those motivations actually existed and the failure to request follow-up questions raises some suspicion, any such suspicion is not sufficient to constitute clear and convincing evidence for overturning the state court findings.  Also, Harris does not point to any similarly situated non-African-American juror for whom the prosecution had missing information, but did not strike from the venire.  The striking of Pickett from the venire is not a sufficient basis for granting federal habeas corpus relief.  But see Justice Harrison's dissent with respect to the Pickett strike.  Harris II, 647 N.E.2d at 908-09 (Harrison, J., dissenting).  See also Harris I, 544 N.E.2d at 389 (Ryan, J., dissenting from the remand of the Picket strike).

## G. Taylor

The peremptory challenge of Essie Taylor[10] by the State was twice considered by the trial court and twice considered by the Supreme Court of Illinois. On appeal from the first Batson remand the Supreme Court of Illinois observed that the trial court found that the State rebutted defendant's prima facie claim because Taylor lived within one mile of where the defendant lived. The Supreme Court found that the prosecutor stated that the venireperson lived near the scene of the crime but never mentioned the fact that she lived near the defendant. Accordingly, the Court remanded the case for new findings and conclusions. Harris I, 544 N.E.2d at 385.

In Harris II, the Supreme Court of Illinois discussed and upheld the challenge as follows:

> *Essie Taylor.* We turn next to Essie Taylor, the second of the three prospective jurors whose exclusion from the jury is at issue in this appeal. Taylor stated during voir dire that she lived on the southeast side of Chicago, near 79th Street. She worked as a licensed practical nurse at a hospital, and she had two children, aged 12 and 15. After high school Taylor had worked at Kresge's while she was receiving her nurse's training. None of her

---

[10]Harris I, 544 N.E.2d at 385, refers to Taylor as the "fourteenth venireperson." After further findings were made on remand, the new findings were discussed in Harris II, 647 N.E.2d at 900-02.

close friends were police officers.  Neither
Taylor nor any of her close family members had
ever been the victim of a crime or had been
accused of committing a crime.

At the original <u>Batson</u> hearing, the
prosecutor explained that he challenged Taylor
because he was not sure what Taylor's husband did
for a living, because she lived relatively close
to the crime scene, and because he wanted to
leave room on the jury for other, more favorable
members of the venire.  At the conclusion of the
hearing, the judge sustained the State's
explanation on the ground that Taylor lived near
the defendant's residence.  In <u>Harris I</u>, this
court rejected the trial judge's finding as
erroneous, noting that the prosecutor, in his
explanation for the challenge to Taylor, had made
no reference to the location of the defendant's
home.  (<u>Harris</u>, 129 Ill. 2d at 186, 135 Ill.
Dec. 861, 544 N.E.2d 357.)  On remand, the trial
judge again upheld the State's explanation of its
challenge to Taylor, citing all three reasons
mentioned by the prosecutor at the earlier
hearing.

We do not find the trial judge's finding to
be clearly erroneous.  We agree with the State
that Taylor's failure to provide more complete
information regarding her husband's work was a
racially neutral reason for choosing to exclude
her from the jury.  Taylor stated on her juror
information card that she was married, yet she
did not answer the question whether her spouse
worked.  In addition, Taylor wrote "self-
employed" in response to the question asking her
to identify her husband's employer, but she
failed to complete a further question that asked
to name his occupation.  As the State notes, the
motivating force for the challenge was not so
much the prosecutor's lack of knowledge of the
juror's husband's work as it was the juror's
failure to candidly provide that information.

A further reason cited by the State for its
decision to exercise a peremptory challenge
against Taylor was the relative proximity of her
home to the crime scene.  During <u>voir dire</u>,
Taylor stated that she lived on 79th Street; the
offenses involved here occurred on 69th Street.

From that information, the prosecutor apparently believed that the juror lived but a short distance, perhaps only 10 blocks, from the crime scene.

Before this court, the defendant notes that the scene of the crime and the juror's home were actually two or three miles apart and were located in separate neighborhoods and community areas of the city. The defendant argues that such a distance is too great to justify the State's exercise of a peremptory challenge against Taylor, especially in the absence of any evidence that the prospective juror was familiar with the crime scene.

Although we agree with the defendant that the prospective juror did not live particularly close to the scene of the crime, we do not believe that the prosecutor's explanation for its challenge to the juror must therefore be rejected. From Taylor's statement at voir dire that she lived on 79th Street, the prosecutor apparently concluded that her home was perhaps only 10 blocks from the crime scene. The defendant contends that this explanation is disingenuous, for Taylor's juror information card clearly indicated he address, and anyone familiar with the city would have realized that the distance between her home and the crime scene was much greater than 10 blocks. We note, however, that at the original Batson hearing conducted in this case, defense counsel seemingly agreed with the prosecutor's rough approximation, describing the distance between Taylor's home and the scene of the crime as "10 blocks, 20 blocks."

It is reasonably clear that the parties in the proceedings below were focusing exclusively on the 10-block difference between the two numbered streets and were assuming that the crime scene and the juror's house lay on the same north/south axis. Although that assumption was incorrect, it is not necessary that the State establish the empirical truth of the reason it cites in support of a challenge to a juror. (Harris, 129 Ill. 2d at 175-80, 135 Ill. Dec. 861, 544 N.E.2d 357.) It is enough for our purposes here that the prosecutor reasonably believed that circumstance to be true.

As a final basis for the challenge to
Taylor, the prosecutor stated that she was
excused so that room would remain for the
selection of what the State regarded as more
favorable jurors.  The trial judge agreed with
the State that this was a race-neutral
explanation, though the judge noted the
difficulty in reconstructing the course of the
<u>voir dire</u> to determine when the specific
challenge was made and what potential jurors
remained for consideration at that time.  We do
not believe that this additional reason is
clearly pretextual, and, because the State's
challenge to Taylor may be sustained on the two
preceding grounds we have discussed, we need not
consider it further.  See <u>People v. Andrews</u>,
(1993), 155 Ill. 2d 286, 294, 185 Ill. Dec. 499,
614 N.E.2d 1184; <u>Harris</u>, 129 Ill. 2d at 176-78,
135 Ill. Dec. 861, 544 N.E.2d 357.

<u>Id.</u>, 647 N.E.2d at 900-02.

The acceptance of the reasons given by the prosecutor for

the strike rested heavily on the credibility of his statements.

In <u>Rice</u>, 546 U.S. at 342, the Supreme Court stated "Reasonable

minds reviewing the record might disagree about the prosecutor's

credibility, but on habeas review that does not suffice to

supersede the trial court's credibility determination."  But <u>see</u>

Harrison, J., dissenting, <u>Harris II</u>, 647 N.E.2d 908-09.  While a

finder of fact could have found otherwise, it cannot be held that

the state courts' findings that Taylor was removed for neutral

reasons was unreasonable or contrary to clear and convincing

evidence.

The striking of Taylor from the venire is not a
sufficient basis for granting federal habeas corpus relief.

## H.  Simmons

Betty Simmons[11] stated that she had worked at the
telephone company for 25 years and her then-current position was
staff clerk.  Simmons was a high school graduate whose husband
was then unemployed.  Her husband had previously worked as a
warehouseman, dockman, and janitor.  Their two children were 23
and 14.  Their 23-year-old son had been held up several years
earlier.  He had not been hurt, but did go to court on the case.
Simmons did not go to court with her son and she was not asked
what the disposition of the case had been.  According to her
juror card, Simmons was 45 years old and owned her home.

Franks's statement regarding striking this venireperson
was:

> Betty Simmons.  Her husband was
> unemployed.  She indicated that her son had gone
> to court on an armed robbery.  Wasn't clear to
> me from her response what the disposition of
> that armed robbery case had been, nor whether
> she was satisfied with the treatment that her
> son had received.
> Again, I did not feel I had a great amount
> of knowledge regarding Betty Simmons.  Her ties
> to the community seemed to be tenuous, and in
> comparison to other jurors I was considering at

---

[11]Harris I, 544 N.E.2d at 385-86, refers to Simmons as
the "final venireperson."  In the briefs and proceedings, she is
sometimes referred to as the "fifteenth venireperson."  After
further findings were made on remand, the new findings are
discussed in Harris II, 647 N.E.2d at 902-03.

>           that time, I did exercise a peremptory
>           challenge.

BH 82.

When stating his findings following the first <u>Batson</u> hearing, the trial judge omitted making findings regarding Betty Simmons.  The Illinois Supreme Court remanded, in part, for additional findings regarding Simmons being struck from the venire.  <u>Harris I</u>, 544 N.E.2d at 385-86.  Following the <u>Harris I</u> remand, the trial judge found that Simmons was stricken from the venire for neutral reasons.  However, the judge rejected Franks's statement that Simmons had a tenuous connection to the community, but found that her husband's unemployment, missing information about the crime against her son, and a desire to reach other venirepersons to be neutral and credible.  As to the last reason, the trial judge found that this reason is supported by evidence that the four jurors seated from Simmons's panel were  "a prosecutor's dream."

The Illinois Supreme Court affirmed the finding that Franks struck Simmons from the venire so he could seat the four jurors that the trial judge described as a "dream" panel. <u>Harris II</u>, 647 N.E.2d at 902-03.  The Court stated:

>           At the conclusion of the <u>Batson</u> hearing,
>           the trial judge inadvertently failed to make a
>           finding regarding the State's exclusion of
>           Simmons.  On remand from this court's opinion in
>           <u>Harris I</u> (<u>see</u> <u>Harris</u>, 129 Ill. 2d at 187-88, 135

Ill. Dec. 861, 544 N.E.2d 357), the judge found no discriminatory intent in the State's decision to remove Simmons from the jury. The judge disagreed with the prosecutor's view that Simmons had only tenuous ties to the community, noting her education and long-term employment in Chicago, but sustained the challenge on other grounds cited by the prosecutor.

The trial judge believed that the four white persons selected as the jury's second panel, at the same time Simmons was excused from service, possessed a number of characteristics that would appeal to the prosecution. Richard Gray, who became the jury foreman, was a college graduate and had a master's degree in business; he worked as a financial analyst for the State of Indiana. Michael Dolan had been employed as a truck driver for 13 years. Lois Gregg was a dental assistant; she had three children in their thirties, and her husband taught at a university in the Chicago area. Finally, Helen Karwowski was retired; her husband had been a pharmacist and had owned his own drugstore. Karwowski has worked at the drugstore and also as an employment counselor, and she had raised four children. The judge described this panel of four as a "prosecutor's dream." Comparing Simmons with these jurors, the judge stated:

> "Again, it appears that the State's
> Attorney was attempting to gain a
> certain kind of 'educated,' 'older,'
> 'conservative,' or 'stable' juror. Gray
> was highly educated; Karwowski and Gregg
> were older; Dolan had been a truck driver
> for 13 years. Simmons was a clerk at a
> telephone company. Her husband--unemployed
> at the time--was, as she put it, a
> 'warehouseman, dockman and janitor. In
> that line of work.'"

Our cases have held that the unemployment of a prospective juror may be a legitimate, race-neutral reason for the exercise of a peremptory challenge. (People v. Kitchen, (1994). 159 Ill. 2d 1, 22, 201 Ill. Dec. 1, 636 N.E.2d 433; People v. Hudson, (1993), 157 Ill. 2d 401, 432, 193 Ill. Dec. 128, 626 N.E.2d 161, People v. Andrews, (1993), 155 Ill. 2d 286, 301-02, 185

Ill. Dec. 499, 614 N.E.2d 1184; <u>People v. Mack</u>, (1989), 128 Ill. 2d 231, 241, 131 Ill. Dec. 551, 538 N.E.2d 1107.) The defendant argues, however, that the unemployment of a prospective juror's spouse should generally be considered irrelevant to jury service, unless the prospective juror indicates to the contrary. (See <u>People v. Powell</u> (1991), 224 Ill. App. 3d 127,133-35, 166 Ill. Dec. 631, 586 N.E.2d 589.) Without answering that question here, we believe that the unemployment of a prospective juror's spouse is a valid concern and may be considered by the prosecutor, at least in combination with other circumstances, in determining whether to exercise a peremptory challenge against a prospective juror.

In selecting a jury in this case, the prosecution was motivated in part by the desire to obtain as jurors persons who were relatively well educated or prosperous. As the trial judge observed in sustaining the State's removal of Betty Simmons, "Whether these sort[s] of distinctions are valid or not, is not the question. Difference[s] in employment, age and status are part of the sparse data given to trial lawyers upon which to make decisions." The trial judge accurately noted that the families of the four persons who were selected as jurors at the time Betty Simmons was excused possessed more education or better employment than did she or her family. Although it is not clear from the record whether the State was required to challenge Simmons to obtain what the trial judge described as the "dream" panel of jurors, we do not believe that the distinctions mentioned by the prosecutor and the trial judge were pretextual or contrived.

At the hearing on remand from <u>Harris I</u>, the trial judge also found acceptable another reason cited by the State in explanation for its peremptory challenge to Betty Simmons: uncertainty over the disposition of the case involving her son. We need not determine here whether this explanation, standing alone, would be sufficient under <u>Batson</u>. We decline, however, to reject it as merely pretextual, as the defendant urges us to do. A family member's

prior experiences as a crime victim may be a legitimate concern of the prosecution in deciding whether to accept or reject a particular member of the venire.

The trial judge carefully considered the evidence before him and concluded that the prosecutor's explanation for the exclusion of Betty Simmons was nondiscriminatory. As we have noted, this determination is one largely of credibility. "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." Hernandez v. New York (1991), 500 U.S. 352, 365. In the present case, the trial judge credited the statement of the prosecutor who took part in the selection of the defendant's jury, finding believable the prosecutor's rationale for choosing to remove Simmons from the jury. We are unable to conclude on this record that the judge's evaluation of the pertinent evidence was clearly erroneous.

For the foregoing reasons, the findings that Franks preferred other venirepersons for neutral reasons must be upheld.

The striking of Simmons from the venire is not a sufficient basis for granting federal habeas corpus relief. But see Harris II, 647 N.E.2d at 909 (Harrison, J., dissenting).

### III.   INEFFECTIVE ASSISTANCE OF COUNSEL

The claim of ineffective assistance of counsel was based on trial counsel's failure to preserve in the record the race of two African-American venirepersons against whom the prosecution

exercised peremptory challenges.  At the first _Batson_ hearing,
the trial judge relied on hearsay in accepting that Christine
Riley Brown and Edward Shealy were African-American and reached
the merits of _Batson_ challenges.  In _Harris I_, 544 N.E.2d
at 378-79, it was held that it was not properly established that
Riley and Shealy were African-American so the merits of _Batson_
claims were not considered on direct appeal.  In post-conviction
proceedings, Harris provided affidavits supporting that both
venirepersons were African-American.  In _Harris III_, on appeal
from denial of post-conviction relief, the Illinois Supreme Court
assumed that it was established that Riley and Shealy were
African-American and also that it was a deficient performance on
the part of trial counsel to fail to adequately establish their
race.  _Harris III_ only addressed the prejudice component of the
ineffective assistance of counsel claim and held that it was not
satisfied because the _Batson_ claims regarding Riley and Shealy
would have been denied on the merits even if the record had been
adequately established.  For purposes of that analysis, the
Illinois Supreme Court reviewed the trial court's _Batson_ findings
regarding these two venirepersons.  _See Harris III_, 794 N.E.2d
at 325-31.  The merits of the _Batson_ claim will be addressed
first.  Ineffective assistance of counsel issues need only be
addressed if Harris could have succeeded on the merits of these

<u>Batson</u> claims.  <u>See</u> <u>Walker v. Litscher</u>, 421 F.3d 549, 558 (7th Cir. 2005).

### A.  Shealy

Certain pages of transcript that include Shealy's voir dire questioning are missing from the record provided to this court.[12]  The parties, however, do not disagree as to what Shealy revealed.  The Illinois Supreme Court summarized as follows:

> During <u>voir dire</u>, Edward Shealy stated that he had a bachelor's degree in music and worked as a docket manager at a Chicago law firm. Shealy had worked at this firm for 3½ years, and prior to this had been a docket manager at a different firm for six years.  Shealy told the judge that he had "plenty" of close friends who were attorneys but did not discuss with them their philosophies about law or law enforcement because "[t]hey don't have time."  Shealy also indicated that he had a close friend who was a "new recruit" with the Chicago police department.  When asked if he ever talked to this friend about his work with the police department, Shealy answered, "None whatsoever." Shealy also stated that he did not talk to this friend about his police training.
> At the <u>Batson</u> hearing, prosecutor Daniel Franks offered several explanations for excusing Shealy.  One of them was that, while Shealy indicated he had "plenty" of close friends who were attorneys, he insisted that he never talked to any of them about their philosophies of law or law enforcement.  Franks stated that this response "did not make sense," and he commented on the demeanor that Shealy displayed while giving it: "I don't think I can do justice in [sic] the way that the juror answered [the judge's] question in terms of his tone of voice and his mannerisms while answering that

---

[12]Petitioner cites VD 259-62.

question." According to Franks, Shealy's answer
was "the type of response that did not give me a
feeling that I wanted him on that jury."

Defendant argues that this explanation
"appears pretextual." He points to three white
venire members-Theresa Najdowski, Richard Gray,
and Michael Dolan-who had friends or family
members who were attorneys[13] and who were
accepted as jurors, even though they were never
asked if they discussed legal matters with the
attorney. Defendant notes that the State
expressed no concern about this issue with
regard to these jurors.

This court has consistently held that where
a prosecutor excludes a minority venireperson
based on a certain characteristic, but does not
reject a white venireperson who shared the same
characteristic, "it does not follow that this in
itself shows that the prosecutor's explanations
were pretextual." People v. Young, 128 Ill. 2d
1, 23, 131 Ill. Dec. 78, 538 N.E.2d 453 (1989);
Harris I, 129 Ill. 2d at 179, 135 Ill. Dec. 861,
544 N.E.2d 357; see Wiley, 165 Ill. 2d at 282,
209 Ill. Dec. 261, 651 N.E.2d 189. In Wiley,
this court explained:

> The State's purposeful discrimination
> is not automatically established by the
> mere coincidence that an excluded juror
> shared a characteristic with a juror
> who was not challenged. The excluded
> juror may possess an additional trait
> that caused the State to find him
> unacceptable, while the juror who was
> not challenged may possess an
> additional characteristic that prompted
> the State to find him acceptable to
> serve as a juror. [People v.] Ramey,
> 151 Ill. 2d [498,] 520, 177 Ill. Dec.
> 449, 603 N.E.2d 519 [(1992)].) '[A]
> peremptory challenge is based on a

---

[13]Najdowski had a close friend who was a corporate
attorney; Gray's father was a corporate attorney; and Dolan had a
cousin who was an attorney.

combination of traits, and a juror
possessing an unfavorable trait may be
accepted while another juror possessing
that same negative trait, but also
possessing other negative traits, may
be challenged.' [People v.] Mitchell,
152 Ill. 2d [274,] at 295, 178
Ill. Dec. 354, 604 N.E.2d 877
[(1992)]." Wiley, 165 Ill. 2d at
282-83, 209 Ill. Dec. 261, 651 N.E.2d
189.

In the case at bar, while Shealy and the
three white jurors shared the characteristic that
they all had close friends or family members who
were attorneys, Shealy possessed "an additional
trait that caused the State to find him
unacceptable." Wiley, 165 Ill. 2d at 283, 209
Ill. Dec. 261, 651 N.E.2d 189. In this instance,
the additional trait was that, unlike Najdowski,
Gray or Dolan, Shealy had "plenty" of close
friends who were attorneys, yet he insisted that
he never talked to them about their philosophies
of law or law enforcement. In such a situation,
the fact that white jurors also had close friends
or family members who were attorneys does not
render the State's explanation for excluding
Shealy pretextual. People v. Young, 128 Ill. 2d
1, 23, 131 Ill. Dec. 78, 538 N.E.2d 453 (1989).

As noted, defendant also objects that no
one asked the white jurors if they discussed
legal matters with their friends or relatives who
were attorneys. The voir dire in this case was
conducted by the trial court judge. This court
has held that "[t]he State's failure to pose
additional questions does not lead to the
conclusion that the reasons given by the State
were a mere pretext for racial discrimination."
Wiley, 165 Ill. 2d at 276, 209 Ill. Dec. 261, 651
N.E.2d 189, citing People v. Kitchen, 159 Ill. 2d
1, 20-21, 201 Ill. Dec. 1, 636 N.E.2d 433 (1994);
Harris II, 164 Ill. 2d at 334, 207 Ill. Dec. 400,
647 N.E.2d 893

At the conclusion of the Batson hearing,
the judge found that the State had exercised its
peremptory challenges for race-neutral reasons
and had rebutted defendant's prima facie case.
With regard to Shealy, the judge specifically

mentioned the explanation that Shealy "works at a law firm" and had "plenty of friends who were lawyers," and concluded that this was an adequate basis for excluding Shealy. In elaborating upon this explanation, the judge opined that because Shealy worked for a large _civil_ law firm, Shealy might take the view that criminal law is not very important.

Defendant challenges the judge's findings on the ground that they do not reflect the reasons actually given by the prosecutor. Defendant argues that Franks' actual reasons for excusing Shealy were not that he worked at a law firm and had friends who were lawyers, or that Shealy thought criminal law was unimportant. Rather, the prosecutor stated that he doubted Shealy's candor when Shealy stated that he never talked to his attorney friends about law enforcement issues or philosophies of the law.

This court has repeatedly held that there is no need for a trial court judge to enter findings with respect to each black member of the venire excluded by the prosecution. _People v. Mack_, 128 Ill. 2d 231, 245-46, 131 Ill. Dec. 551, 538 N.E.2d 1107 (1989); _People v. Fair_, 159 Ill. 2d 51, 76, 201 Ill. Dec. 23, 636 N.E.2d 455 (1994); _Harris II_, 164 Ill. 2d at 335, 207 Ill. Dec. 400, 647 N.E.2d 893. In both _Mack_ and _Fair_, the circuit court judges who conducted the _Batson_ hearings found at the conclusion of the hearings that the explanations offered by the prosecution were race-neutral and sufficient under _Batson_. In each case, the judge made only this general finding and did not enter specific factual findings for each black venireperson excluded by the State. We held in both _Fair_ and _Mack_ that such a general finding was specific enough for our purposes and that there was no need for the circuit court judge to make specific findings as to the State's explanations for each such peremptory challenge. "In both of those cases, we noted that the record contained the prosecutor's explanations for the separate challenges made to the minority members of the venire, and, in reviewing in each case the trial judge's findings of no discriminatory intent, we considered the explanations provided by the

prosecution." <u>Harris II</u>, 164 Ill. 2d at 335, 207 Ill. Dec. 400, 647 N.E.2d 893. If our review of a <u>Batson</u> claim may proceed in the absence of specific findings by the circuit court as to each minority person challenged by the State, we see no reason why, in a case where the judge does make specific findings, we should be limited only to those findings and prevented from independently considering explanations provided by the State but not expressly ruled on by the judge.

Our decision in <u>People v. Williams</u>, 164 Ill. 2d 1, 206 Ill. Dec. 592, 645 N.E.2d 844 (1994), is exactly on point as to this issue. Following the trial court judge's decision that defendant had made a <u>prima facie</u> case with regard to the exclusion of Alvin Pettigrew, an African American venireperson, the State in <u>Williams</u> then provided its reasons for exercising a peremptory challenge against Pettigrew. The first two of these reasons were that Pettigrew kept his hat on during <u>voir dire</u>, which the prosecutor said she thought was disrespectful, and that Pettigrew gave short, cryptic answers to the questions asked. The judge mentioned each of these reasons in finding that the State's explanation was legitimate and race-neutral. However, the judge did not mention the third reason provided by the State: "Pettigrew's lack of knowledge concerning the employment of one of his four children, a 24-year-old son who, he said, '[w]orks downtown somewhere.'" <u>Williams</u>, 164 Ill. 2d at 20, 206 Ill. Dec. 592, 645 N.E.2d 844. Nevertheless, this court proceeded to consider this reason and concluded: [It] "appears to be a legitimate, race-neutral one. The <u>record</u> makes plain that the finding of the circuit court is not clearly erroneous." (Emphasis added.) Williams, 164 Ill. 2d at 21, 206 Ill. Dec. 592, 645 N.E.2d 844. Just as this court in Williams examined a reason not explicitly ruled upon by the trial judge, so here we have considered the reasons advanced by the prosecutor for excluding Shealy, including those not explicitly ruled upon by the trial judge. Based on our review of these reasons, we cannot say that the judge's determination that they were legitimate and race-neutral is clearly

> erroneous.  _Hernandez v. New York_, 500 U.S. 352,
> 364-65, 369 (1991); _Wiley_, 165 Ill. 2d at 274,
> 209 Ill. Dec. 261, 651 N.E.2d 189; _Harris II_,
> 164 Ill. 2d at 333, 207 Ill. Dec. 400, 647 N.E.2d
> 893.  We therefore reject defendant's _Batson_
> claim as to the exclusion of venire member Edward
> Shealy.

_Harris III_, 794 N.E.2d at 328-30.

As he did before the Illinois Supreme Court, Harris

argues here that this explanation is pretextual because a number

of Whites selected for the jury had lawyer or law enforcement

friends or relatives but did not discuss legal or law enforcement

issues with them or were not asked if they discussed such issues.

In addition to noting that it was the trial judge who controlled

the questioning, the Illinois Supreme Court noted that treating a

White venireperson with a particular characteristic differently

than an African-American venireperson with the same

characteristic is not evidence of pretext if there is an

additional characteristic that differentiates the two.  Here, the

Illinois Supreme Court found that Shealy was different because he

had so many friends that were lawyers or involved in law

enforcement.  _See_ _id._ at 329.  It is certainly not surprising

that a venireperson who works at a law firm would be asked about

whether he discusses legal issues with his friends there,

especially when he stated that he was friends with many of the

lawyers.  The findings of the Illinois Supreme Court are not

unreasonable.  Harris cannot satisfy the prejudice prong of his ineffective assistance of counsel claim based on the striking of Shealy from the venire.

## B.  Riley

Christine Riley Brown was a 34-year-old high school graduate who had been working for six years as a directory assistance operator for the telephone company.  When asked if she lived in "Hyde Park or Kenwood," Riley responded "Yes."  Before working at the telephone company, she had married and stayed home raising her two children who were 8 and 16 at the time of the voir dire.  At the time of the voir dire, she was separated from her husband.  Riley reported that a nephew had been stabbed during a fight.  She knew little about the circumstances and stated that it would not affect her ability to serve.  VD 231-34. As to the nephew the testimony was:

> Q. [Judge]  Have any close friends or
> family members ever been the victim of a crime?
> A.  Yes.
> Q.  Would you tell us about that?
> A.  My nephew was stabbed.  This happened
> about three months ago.
> Q.  How is he now?
> A.  He is all right.
> Q.  And where did this happen?  What street
> or school or --
> A. In front of his house on the south side
> of Chicago.
> Q. And did you visit him at all in the
> hospital or anyplace else?
> A.  No, I didn't.
> Q.  Was he in the hospital?
> A.  He was in for about a week.

Q.  Do you know anything about that, why
it happened, or anything of that nature?
A.  I don't know exactly why.  It was a
fight.  I don't know exactly what happened.
Q.  Is there anything about that event that
would influence your judgment in this case at
all?
A.  No.
Q.  You could put that out of your memory
and decide this case on its own status?
A.  Yes.

Id. at 233-34.

Regarding Riley being stricken from the venire, Franks

stated:

She lived in the Hyde Park area.  She had a
nephew that she indicated had been stabbed just
three months before the time she was being voir
dired, and she told your Honor that she didn't
know what had happened to her nephew.  She then
indicated that it was a fight and she didn't seem
to know who was charged, or if her nephew was
charged or the other party or parties had been
charged.
It seemed very possible that, after hearing
her responses, that her nephew may have been the
considered target of investigation or a charged
individual in that case, and it was not clear to
me whether she was telling the Court and the
attorneys all she knew about this matter, and I
did not feel that her responses were such that
she would be a juror that I would want sitting at
this trial.
She indicated she was separated from her
husband, and again, her card was incomplete as to
her husband's employment and other information
regarding her husband.  I did not know what the
reason for that was, and whether there was some
friction or animosity there that may have made
her have some emotional feelings or may have made
her an acceptable juror to consider this case.

BH 76-77.

Other than his general finding that all the challenged strikes had been exercised for race-neutral reasons, the trial judge's findings as to Riley were:

> The second reason was that Miss Ellen Ogden lived in the community of Hyde Park in this community. This explanation goes for Christine Riley, although Miss [sic] Riley also had a nephew who was in trouble, and was separated from her husband, and there were other reasons that I think amounts to a non-racial reason for excluding Miss [sic] Riley.

Id. at 140.

The Illinois Supreme Court only addressed the explanation that Riley was stricken because she lived in the Hyde Park area. It held that the trial court's finding that she was dismissed for this reason was not clearly erroneous. Harris III, 794 N.E.2d at 327-28.

Harris argues that the record shows this explanation, as well as Franks's other stated reasons, are pretextual. He again argues that Riley responded that she lived in Hyde Park or Kenwood, not necessarily Hyde Park. As the Illinois Supreme Court explained, Franks did not testify he relied on her living in Hyde Park, but that she lived in the Hyde Park area. Id. at 327. Similar to vernireperson Alexander, Harris points to Riley's occupation as a telephone operator as showing she did not

actually have the scholarly, academic characteristics that Franks disdained in Hyde Parkers. The Illinois Supreme Court explained that the question is not whether the person actually had the characteristic nor whether the characterization was generally true of Hyde Park residents, but whether or not the prosecution was genuinely motivated by where Riley resided. Id. It held that the trial court's finding to that effect was not clearly erroneous. On federal habeas review, it cannot be held that this finding of the Illinois courts was an unreasonable determination; there is no clear and convincing evidence to the contrary.

Harris also contends that the other reasons proffered by Franks are pretextual. When all but one proffered reason is shown to be pretextual, that undermines confidence in the sincerity of the remaining reason. Franks raising the possibility that Riley's nephew was charged with a crime is questionable since Riley was responding to a query as to whether any relative was a "victim" of a crime. That statement, however, is not so implausible an interpretation of Riley's testimony that it was unreasonable for the trial court to accept this explanation. Harris also questions any reliance on Riley's marital status, pointing to two White jurors who were divorced and did not include their husbands' occupations on their juror

cards. Franks's testimony on this subject is unclear. Harris interprets it as being that Franks was afraid Riley would be too emotional to adequately serve on a jury. In any event, this does not appear to be Franks's primary reason for excluding Riley. Also, Riley was separated, not divorced, and the separation may have been recent. While Franks's explanation for striking Riley could be questioned, the findings of the Illinois courts that she was stricken for neutral reasons is not an unreasonable determination that is inconsistent with clear and convincing evidence to the contrary. Harris cannot satisfy the prejudice prong of his ineffective assistance of counsel claim related to Riley being stricken from the venire.

Harris also contends that he was prejudiced by his trial counsel's failure to establish the race of Shealy and Riley because he was then unable to show that 17 strikes were exercised against African-Americans. In this case, there is not a material difference between exercising peremptory strikes against 17 of 19 African-Americans or 15 of 17 African-Americans.

Since Harris cannot satisfy the prejudice prong of his ineffective assistance of counsel claim, he cannot be granted relief on this claim.

## IV.  BRADY EVIDENCE

The final issue to address concerns Harris's sentence.
This issue requires a determination of facts.

Harris contends that the failure to disclose <u>Brady</u>
material that would have been used to impeach a witness at his
capital sentencing hearing requires that he be resentenced even
though his capital sentence has been commuted to natural life.
Prior to the capital sentence being commuted, <u>Harris III</u> held
that the allegations of the post-conviction petition, which are
essentially the same as those in the federal habeas corpus
petition, supported that a <u>Brady</u> violation occurred and that the
undisclosed evidence was material to the decision to impose the
death penalty.  <u>Harris III</u>, 794 N.E.2d at 346.  The State's
argument that the evidence was not material was rejected as
inconsistent with the allegations of the post-conviction petition
and therefore something that could only be resolved after an
evidentiary hearing.  <u>Id.</u>  Before an evidentiary hearing could
be held, Illinois's governor commuted Harris's death penalty
to natural life.  Harris contends this did not moot his claim
because it is possible he could be resentenced to 20
to 40 years of incarceration.  Ill. Rev. Stat. ch. 38,

¶ 1005-1-8-1(a)(1) (1983). The trial court, however, did not hold an evidentiary hearing, instead holding that the <u>Brady</u> issue was moot in light of the commutation. (The theory of this ruling is that the sentence now rests on the action of the executive and not on judicial proceedings.) The Illinois Appellate Court affirmed this ruling in an unpublished order, <u>see</u> <u>Harris IV</u>, and the Illinois Supreme Court denied leave to appeal. <u>People v. Harris</u>, 849 N.E.2d 334 (Ill. 2006).

In response to the <u>Brady</u> claim in the federal habeas corpus petition, respondent no longer contends the issue is moot and does not invoke any procedural default. Instead, respondent addresses the merits, again contending that the evidence was not material, it was not withheld by the prosecution, and Harris's counsel was aware of the impeaching evidence prior to the re-sentencing.

The materiality issue before this court is somewhat different than that before the Illinois Supreme Court. The Illinois Supreme Court was considering the possible effect on imposing a capital sentence. Here, the question is whether, in light of missing impeachment evidence, there is a reasonable probability that a judge would impose a sentence of 20-to-40 years rather than natural life.

## A.  Proceedings and Legal Standards

After conducting discovery consisting of document examination and the joint interview of attorneys who represented petitioner and the State at the first and second sentencing hearings, the parties entered into a written stipulation of what testimony each attorney would give if called to testify at a hearing before this court.  The parties have provided transcripts of each of the sentencing hearings; the Henrotin Hospital medical records of the treatment of John Szumigala during the period February 19-21, 1971; a transcript of Szumigala's testimony at the 1971 robbery trial of petitioner; and the stipulation of the testimony of the physician who treated Szumigala's injuries at Henrotin Hospital, which was read into the record at the first sentencing hearing.  A reference to Szumigala's testimony by the sentencing judge is contained in the explanation of his sentence imposing the death penalty and terms of years on certain counts.

> Brady set forth the now familiar principle
> that "the government has the affirmative duty to
> disclose evidence favorable to a defendant and
> material either to guilt or punishment."  United
> States v. Fallon, 348 F.3d 248, 251 (7th Cir.
> 2003).  A successful Brady challenge requires a
> defendant to show "(1) that the prosecution
> suppressed evidence; (2) that the evidence was
> favorable to the defense; and (3) that the
> evidence was material to an issue at trial."
> United States v. Silva, 71 F.3d 667, 670

(7th Cir. 1995) (citing <u>United States v. White</u>,
970 F.2d 328, 337 (7th Cir. 1992) & <u>United
States v. Hartmann</u>, 958 F.2d 774, 790 (7th Cir.
1992)). Evidence is material if "there exists a
'reasonable probability' that its disclosure to
the defense would have changed the result of the
trial." <u>Silva</u>, 71 F.3d at 670 (citing <u>Kyles v.
Whitley</u>, 514 U.S. 419, 433 (1995); <u>United
States v. Bagley</u>, 473 U.S. 667, 682 (1985) &
<u>United States v. Boyd</u>, 55 F.3d 239, 245 (7th Cir.
1995)). The prosecution has "a duty to learn of
any favorable evidence known to the others acting
on the government's behalf in the case, including
the police." <u>Kyles</u>, 514 U.S. at 437. The
government's <u>Brady</u> obligation encompasses
impeachment evidence. <u>United States v. Dabney</u>,
498 F.3d 455, 459 (7th Cir. 2007).

<u>United States v. Bland</u>, 517 F.3d 930, 933-34 (7th Cir. 2008). A

reasonable probability is a probability sufficient to undermine

confidence in the outcome. <u>United States v. Salem</u>, 578 F.3d 682,

686 (7th Cir. 2009) (quoting <u>Kyles</u>, 514 U.S. at 435).

Harris must prove his allegations of fact by a

preponderance of the evidence. <u>Zapata v. Estelle</u>, 585 F.2d 750,

751-52 (5th Cir. 1978).


## B.   FINDINGS OF FACT

Based on the parties' submissions, the court finds the

facts to be as follows:

1. A search of the records of the office of the Cook

County State's Attorney and a search of the records of the Cook

County Public Defender did not reveal a copy of the Szumigala
Henrotin Hospital medical records.

2. John Szumigala was attacked, robbed and beaten by six
men on February 19, 1971, at about 8:00 p.m., while crossing a
bridge on his way to the Goodman Theater in downtown Chicago,
Illinois. The attackers included James Harris, a/k/a James
Carter, who was the leader of the group. Money, a watch, rings,
coats, and an umbrella were taken. Harris put on one of
Szumigala's coats.

3. Szumigala testified in the 1971 robbery trial of
Harris (a/k/a James Carter). Szumigala fell down after being
punched in the stomach by Harris. Szumigala stated "he kicked me
in the right eye, which now I have eye damage too. I passed out
and I came to again and he was kicking me in the ribs. My
peripheral vision is badly damaged on the side. It's blurred
there and many days I wake up I have severe headaches and vision
is blurred."

4. After the attackers left, Szumigala went to a parking
lot guard station for help. He was taken to Henrotin Hospital
for treatment and was a patient there from February 19 to 21,
1971. Harris was arrested and brought to Henrotin Hospital on
the night of February 19, 1971. When he was identified by
Szumigala, Harris was wearing Szumigala's coat. The police also

had Szumigala's watch.  Harris was convicted of robbery and sentenced to four to eight years in prison.  See People v. Carter, 12 Ill. App. 3d 902, 299 N.E.2d 165 (1st Dist. 1973) (abstract)

5.  Szumigala was not called to testify at the first Harris sentencing hearing in 1984.  However, the following stipulation was stated for the record:

> If Dr. Banuchi was called to testify he would
> state that on February 19, 1971, he was a
> physician and surgeon licensed to practice
> medicine in the state of Illinois.  On that date
> that he was working in the emergency room at
> Henrotin Hospital located at 111 West Oak Street,
> Chicago, Illinois.  It would be Dr. Banuchi's
> testimony that he had occasion to treat a patient
> in the emergency room by the name of John
> Szumigala.  He would further state that at the
> time he observed the patient in the emergency
> room he noted several aspects about his physical
> condition and made certain diagnoses with respect
> to his physical condition.  The doctor would
> state that he examined the victim's eyes and at
> that time observed the presence of an abrasion
> above the occipital region, that also the patient
> had right upper and lower eyelid hematoma.  There
> were also small lacerations at the right upper
> eyelid.  Also the patient had subjunctoral
> hematoma present in both eyes.
>     The doctor would further state that upon
> his examination of the patient's nose he observed
> tenderness and discoloration on the right side of
> the nose; that he further examined the patient's
> mouth at which time the patient had hematoma to
> the upper lip as well as a laceration to the
> lips.  The doctor would further testify that the
> patient complained of soreness to the shoulder
> and chest area and the doctor did diagnose slight
> tenderness to the chest area.  The Doctor would

further state that his impressions and diagnosis of the patient in the emergency room within a reasonable degree of medical certainty was that he suffered contusion of the right eye, laceration to the right upper eyelid, contusion to the nose and upper lip; also that he had a possible cerebral concussion as a result of his incident on the street.

He would further state that he had a contusion to the chest. The doctor would further testify that he had occasion to order then x-rays for the patient, those consisting of x-rays of the patient's chest, mandible bones, nasal bones, ribs, shoulder, rib cage, and skull as well as zygoma -- or zygomatic arches. The Doctor would state that all the x-rays were negative with respect to fractures and the injuries were confined to the tissues themselves.

So stipulated?

MR. KUNZ: So stipulated.


6. Szumigala was called to testify at the second Harris sentencing hearing in 1992. At that hearing, he testified that Harris told one of the attackers to "cut off his finger" if he could not remove a ring from Szumigala's hand. Szumigala also quoted Harris as saying "I'm going to kill this guy." Szumigala stated that his right eye started to bleed and that there were stones in his eye. Szumigala stated that he cannot distinguish colors which has prevented him from working in certain design activity. He has violent headaches; required dental work; and his right shoulder was dislocated.

7. Szumigala was cross-examined about his 1971 testimony. Portions of his 1971 testimony were read into the

record, and he admitted that he had not testified to statements by Harris saying "cut off his finger" or "I'm going to kill this guy." Szumigala was not asked about his injuries on cross-examination. No reference was made at the second sentencing hearing to the first sentencing hearing stipulation of Dr. Banuchi's testimony.

8. The Henrotin Hospital medical records are inconsistent with the nature and extent of Szumigala's immediate injuries on February 19, 1971, as related by him at the second sentencing hearing. However, the medical records are substantially consistent with the stipulation of Dr. Banuchi's testimony stated at the first sentencing hearing. This stipulation fairly summarizes the contents of the medical records. The additional detail contained in the records would not provide a substantial addition to the stipulation.

9. William Kunz represented James Harris at his trial and first sentencing hearing in 1984. At the time, he was an Assistant Public Defender assigned to the Homicide Task Force. He had been in the Defender's Office for ten years before the trial and had tried at least ten murder trials. At the present time, he is retired from the office.

Kunz vaguely remembers entering into a stipulation regarding Szumigala's injuries at the capital sentencing hearing.

He believes that the prosecutor must have shown him the hospital medical records before he entered into the stipulation. Kunz recently reviewed the stipulation and is not surprised that he agreed to its language, since it indicates, in Kunz's opinion, that the injuries were minor. Had Kunz received a copy of the medical records he would have placed them in the Defender's file. He has no recollection of placing them in the file although he agreed that they could have been received and inadvertently misplaced. Kunz had no further involvement after the motion for a new trial. It was his practice, when ending his involvement in a case, to tidy the file and discard his notes.

10. Joseph McElligott joined the Public Defender's office in 1978. Before the Harris case, he had handled at least two capital cases. In 1992, he was assigned to assist private attorney Michael Levitan in representing Harris. At some point, Levitan withdrew and McElligott represented Harris with the assistance of Stuart Katz. Currently, McElligott is retired from the Public Defender's Office and in private practice.

McElligott read the record of the first sentencing hearing; contacted witnesses (other than Szumigala); employed a mitigation specialist; and talked to William Kunz. McElligott received a transcript of Szumigala's testimony at the 1971

robbery trial of Harris (a/k/a James Carter) and was informed
that Szumigala would be a witness at the sentencing hearing.
The State did not tender Szumigala's medical records to
McElligott. McElligott first saw the medical records during
1997 post-conviction proceedings.

During cross-examination, McElligott questioned Szumigala
with information from the 1971 robbery trial transcript, about
who was present during the assault of Szumigala and who spoke.
McElligott tried to point out that Szumigala's testimony was
different from his 1971 testimony. At the time, McElligott
believed his impeachment of Szumigala was successful.

McElligott remembers Szumigala as someone who exaggerated
or embellished his injuries. McElligott did not introduce the
medical stipulation from the first sentencing hearing or question
Szumigala about his injuries at the second sentencing hearing.

11. Timothy McKay was an Assistant State's Attorney of
Cook County. He was one of the prosecutors at the Harris trial
and first sentencing hearing. He left the State's Attorney's
Office in 1984 or 1985 and is currently in private practice.

McKay has no independent memory of John Szumigala or of
the medical stipulation at the first sentencing hearing. McKay
made the entry in the trial notes, at page 7, "stip to meds."
From reading the stipulation, McKay now believes that he must

have possessed Szumigala's medical records.  In McKay's experience, the Public Defender had his own set of records to ensure that a stipulation was accurate.

12.  Mary Margaret Brosnahan was an Assistant State's Attorney of Cook County who participated in the 1992 sentencing hearing, assisting Wayne Meyer.  She is now a Circuit Court judge in Cook County.

Brosnahan first became involved in the second sentencing proceedings in June of 1991.  When she obtained the file, it did not contain John Szumigala's medical records or any other information or materials regarding the 1971 robbery in which Szumigala was a witness.  The files she obtained were microfilmed and portions of the original files were sorted by clerical help who decided what to discard and what to microfilm.

Brosnahan used an old address from a police report to locate Szumigala.  She spoke with him first by telephone. Brosnahan spoke briefly with Szumigala before he testified.  At no time did Szumigala ever tell Brosnahan about any other injuries, doctor visits, or operations.  In Brosnahan's opinion, Szumigala was much more loquacious on the witness stand than he had been when she prepared him for his testimony.

Brosnahan never saw or possessed Szumigala's medical records.  She thought she had no need to obtain the records.  She

assumed the prosecutors at the first hearing must have had the medical records in order to enter into a stipulation.

13.  Wayne Meyer was a felony trial supervisor in the Cook County State's Attorney's office at the time of Harris's second sentencing hearing.  He later became a Cook County Circuit Court judge and is now retired.

Mayer cannot recall what was in the State's file.  He does not remember ever seeing or possessing Szumigala's medical records, but assumes that they were obtained before the first trial.  The file room was a mess and files were stripped of excess materials.

14.  Based on the testimony and exhibits, it is more probably true than not that the Szumigala medical records were present in the courtroom and examined by the attorneys for the prosecution and the defense at the first sentencing hearing. Whether copies were made for, or retained by, either side is not proven.

15.  The prosecutors at the second sentencing hearing did not have copies of the Szumigala medical records.  The prosecutors did not intentionally withhold the Szumigala medical records from the petitioner.

16.  At the second sentencing hearing, Harris testified that he had "never been a violent person" and "never hit a person

in my life." On cross-examination, Harris gave his version of his encounter with Szumigala. Harris claimed he was walking home alone from the Art Institute when Szumigala, accompanied by several others, approached him, said something, and started a fight with him. [Res. Exh. A at U20-22]. Harris claimed he won the fight and walked away, but did not take any of Szumigala's property. [Id. U23, 25].

17. At the conclusion of the second sentencing hearing the trial judge explained his sentence as follows:

> I have reviewed the trial transcript for relevant information regarding imposition of sentence. I have reviewed the letters which the defense has also tendered from the persons who could not be present for this sentencing hearing. I have reviewed the records which the parties agreed that I could pursue regarding the [petitioner's] adjustment while in the institution. Other exhibits have been produced and made a part of this record.
>
> After reviewing all those items, including also the report of Mr. Randall, there are certain comments which I will make in order to perfect a record. As has previously been found the [petitioner] is eligible under the statute for the imposition of the death penalty based upon the nature of this offense and the fact that it occurred during an attempt armed robbery.
>
> As I speak now before me are four pieces of artwork which [petitioner] has produced. I find those pieces to be very impressive. And like Mr. Meyer, to some degree I am not a connoisseur of art. If somebody draws two straight lines, it's something more than I can do. But to my eye these are very impressive pieces of artwork which suggest to me that [petitioner] has a great

degree of talent which he can transfer from his mind into the manual skill on the canvas.

I have reviewed Mr. Randall's report, and I have listened intently to the information about [petitioner's] background, his childhood, the family [in] which he grew up. And certainly if we use as an analogy the canvas, there are some rips and tears in the canvas of his life in that there are some things about his life that are not the best.

His father and the life in which he was brought into and the occurrences during that life of violence between his mother and father are certainly negatives in [petitioner's] life. One of the things that is very concerning to the court though in terms of whether or not his life and the things he was faced with are really things that should be mitigation that should preclude the imposition of the death penalty is the fact that only he of his siblings in his family has found himself in this situation.

The witness who testified, his sister who testified said that none of the other children have ever been convicted of any felonies, only [petitioner]. Now, according to the file as I view it, he has only one brother, that being John, but even that brother, although he talks about and certain information that I reviewed that he did get involved at one point in a fight in which one of the other members of the family had been abused, and he literally took the law into his own hands to deal with that situation, but no one else had found that based upon that family life that they must go out and commit crimes and be involved in criminal activity.

Certainly [petitioner] in his testimony here today has talked about the way he feels for his family, and it is clear in this record that his family and other persons who are not family members feel strongly about him.

Although certainly Ms. Vader who came in and testified, her interactions with [petitioner] happened at a time when he was on death row. And although, and I do not understand the State's posture that she visits people on death row, and

apparently has a number of people who, although
they be on death row are friends of Ms. Vader.
Her testimony and her feelings about [petitioner]
I do not find to be simply those feelings of a
person who has empathy for people on death row.
She seems to suggest, and her testimony was that
she personally finds [petitioner] to be a person
who she genuinely cares for and had great empathy
for.

The letters which I reviewed which he sent
to her again show a great deal of talent, a deep
wit, an understanding and a real knowledge of and
concern for her and for other issues in life that
are illustrated by his caricatures, and drawings,
and comments on the envelopes. So certainly
there are people who care about [petitioner], and
I'm sure he cares deeply about certain
individuals.

What happened at the time of this
occurrence back in 1983 is something that the
court is mindful of in terms of the incident
itself. Although we can't speculate as to why,
as Mr. Meyer did, as to why [petitioner] chose to
commit this offense in the manner which he did,
and I think it would be remiss of me were I to
say that despite [petitioner'] indication on the
stand that he did not commit his offense, based
upon the records, based upon my opportunity to
observe the witness, the surviving witness who
testified, Mrs. Woods, there is no question in
this court's mind, and it's not an issue before
this court. And I want the record to be clear
and I am convinced beyond any doubt based on the
record before me that [petitioner] did in fact
kill Mr. James and that he in fact shot Ms.
Woods.

And I don't need to speculate as to why it
happened, in the way it happened, and why he went
in and did not go in and rob him at the door as
Mr. Meyer did. His actions speak for themselves.
The shooting of Mr. James was something that was
totally unnecessary. But I think you can say
that of almost any murder. There is never a good
reason to take somebody else's life, whether it

be for their property or because they wear the wrong color jacket or for any other reason.

After Mr. James was shot, and even before Mr. James was shot, there were comments though that Ms. Woods testified to that say a lot about [petitioner]. His comment that he did not know her children or did not care about them or about the fact that she was pregnant. His indication to her that he had just gotten out of the penitentiary, and no matter what happened in this case, if he was caught he would go back and he would never get out again. That was the tenor of those comments. That suggests to me that [petitioner] is making calculated decisions at the time of this offense. That his primary concern was not who he might hurt or who might be hurt as a result of this incident, but simply what this offense means to me and what is going to happen as a result of it.

Although nobody argued it, I in reading the trial transcript, and though it might not have been very clear to me at the time Ms. Woods testified, when she fell, it was clear to me now that she fell and that she was face up. There was some testimony at the original trial that she raised her hand, and that she turned to her left and at that time is the time [petitioner] fired the shot. I asked the question because it wasn't testified to where she was shot at. She was shot in the right shoulder, as she began to roll over from her back to her stomach. This was a cold act to shoot a lady that you know is pregnant, that she has four children. She is no danger to you. You have all other directions in the world in which you could flee. The car is there. You could literally push Mr. James out and take the vehicle. But to pursue this lady as she lay on the ground and says don't do this, to shoot that gun into that lady is a cold act. And to do that act, as we agree under our law, would allow for the imposition of the death penalty.

The conduct on the bridge on Jackson street some 20 years ago, the beating that was administered to this individual, the comments of Mr. Szumigala had testified about other people

saying we got what we want and let's go, and
[petitioner's] position that I am going to kill
this guy, [petitioner]'s indication to me in open
court today or indication to Mr. Meyer in
response to question that he didn't do that, that
this was just an encounter that it was a fair
fight and that he just happened to win is just
unbelievable.

It has always been my position and even is
my position today that the justification for the
death penalty in our society is something that I
disagree with, mainly because I don't know that
it is really a deterrent, mainly because I don't
know that it is always equally imposed, mainly
because by the time it happens, those people who
are most affected by the conduct which has
resulted in that penalty are long gone and
forgotten.

But the death penalty is part of our
law.  It is a statute which is found to be
constitutional.  And under those circumstances, I
believe that it should be reserved and only
imposed in those cases where no other penalty
meets the conduct of the person who has been
convicted of the offense.  No other penalty would
satisfy society or be appropriate in our society
to deal with the conduct and the background of
the person who has been convicted of the offenses
for which the death penalty has not been found to
be applicable.

The statute says that in order to impose
the death penalty, the court must find that there
are no mitigating circumstances to preclude the
imposition of that sentence.  I have searched
this record.  I have searched my mind.  I have
listened and looked at [petitioner].  I have
looked at his artwork.  I have listened to his
family, looking, searching, and hoping in all
candor that there would be some mitigating
circumstance to preclude the imposition of the
death penalty.  Despite that diligent search, I
have been unable to find any such mitigating
circumstances.

Based upon this record, based upon the
prior conduct and criminal history of

[petitioner], based upon the facts and
circumstances of this case, I simply find no
mitigating circumstances to preclude the
imposition of the death penalty.  And therefore,
it would be the finding of this court that
[petitioner] will be sentenced to death for the
offense of murder.

Resp. Exh. A at U87-95.

18.  The Henrotin Hospital medical records of John
Szumigala were not missing material evidence at the second
sentencing hearing of James Harris.  The nature and extent of
Szumigala's injuries, even if exaggerated, were not material at
that hearing nor did they affect the death sentence imposed.

## CONCLUSIONS

The failure of the State to tender the medical records of
John Szumigala to petitioner's attorneys prior to the second
sentencing hearing did not deprive Harris of due process.  The
unavailability of the medical records did not have a reasonable
probability of affecting Harris's present sentence of natural
life.

The attorney who represented Harris at the second
sentencing hearing had a transcript of the first sentencing
hearing, which included the Szumigala medical stipulation.  He
was informed that Szumigala would be a witness at the second

sentencing hearing and was provided with Szumigala's testimony at the 1971 robbery trial. Petitioner's attorney could have contrasted Szumigala's injuries testimony with the stipulated findings of Dr. Bahuchi at the first hearing if he had chosen to do so. He believed, however, that he had conducted effective impeachment of Szumigala at the second hearing by proving the absence in his testimony at the robbery trial of certain statements attributed to Harris.

The judge who imposed a death sentence at the second hearing did not mention Szumigala's injuries. His only reference to the 1971 robbery trial was in rejecting Harris's version of the 1971 robbery as a fight started by Szumigala. There is no basis for finding that the additional proof of the exaggeration of injuries by Szumigala would have been a factor in the judge's analysis of the evidence.

The sentencing judge carefully analyzed the murder and aggravation evidence. He was aware of the previous sentences that had been imposed. The judge had the option of imposing a death sentence, a sentence of natural life, or a sentence of a term of 20 to 40 years. See Ill. Rev. Stat. ch. 38, ¶ 1005-8-1(a) (1983). By the commutation of petitioner's sentence to natural life, there only remains the possibility that a third sentencing, if required because of a Brady violation, could benefit Harris by resulting in a sentence of 20-to-40 years. On

this record, there is no reasonable probability that, using the actual medical records for additional impeachment of John Szumigala, would result in such a sentence. The missing impeachment does not undermine confidence in the sentence of natural life.

IT IS THEREFORE ORDERED that Frank Shaw in his official capacity as the warden of Stateville Correctional Center is substituted for respondent Terry McCann and the Clerk of the Court is directed to amend the docket accordingly. Petitioner's motion for oral argument [45] is denied. Respondent's motion for leave to file a surreply [49] is granted. The Clerk of the Court is further directed to enter judgment in favor of respondent and against petitioner denying the petition for a writ of habeas corpus.

ENTER:

_William T. Hart_
UNITED STATES DISTRICT JUDGE

DATED: JANUARY 13, 2010